In the beginning there is a message, and this message is life, and this message is in life. And if this message is a human message, this life is a human life. It is also the beginning of a very old book, the Gospel according to St. John. In the beginning was the Word. And the World Dean of Geneticists, Dr. Jerome Lejeune, who received from our nation's President Kennedy, from Kennedy's own hand, our nation's highest award for isolating the X21 chromosome responsible for Down syndrome, who made that statement, went on to observe that it's very comforting to we scientists that it took us only 2,000 years to discover what we say all along. In the beginning was the Word. Isn't the question in this case about venue? I mean, I really think that, I mean, your argument is quite eloquent, but it's not really addressing the question that we have to decide today. And I understand that we're here on a limited purpose, but I think it's important to not lose sight of the essential of what... We can't, no matter how we might feel about the Gospel, we can't change the venue laws. So why don't we look at the venue laws? Because, frankly, I don't want to sit here for 40 minutes talking about things that are not relevant to a decision that we have to make in this case. Understandable. Yeah, sure, I'm coming to that. I wanted to open with introducing our plaintiff. Incidentally, the last case of the threat of the nuclear bomb, I remember Dr. Lejeune said that the biological bomb is probably more dangerous to humanity than the thermonuclear bomb. What? Plaintiff's action challenges the facial validity of various state constitutional and statutory provisions added or enacted by the statewide initiative measure. Now, venue is proper, we would respectfully submit, in the central district under section 1391b2. As a substantive part of the events or omissions giving rise to the plaintiff's claims are alleged or have been shown to have occurred in the central district. To what? Number one. Well, of course, we're alleging that this initiative, on behalf of the state of California, will take away from the available human embryos for adoption. As an example, one of our lead plaintiffs, Susan Murray. Doe is the Doe plaintiff. We're not talking about Doe now, right? We're talking about these individuals in Riverside. Yes, but the Doe plaintiff is a pseudonym representing the human embryos in the deep freeze that can be taken and given birth. Doe is not really, let's forget Doe for a second, because Doe may not even reside in California, according to your complaint. Doe may reside outside of California. Let's not talk about venue for Doe at this moment. We're talking about people who may wish, who are seriously thinking about adopting an embryo from someplace, maybe California, maybe not, but from someplace, correct? And they say there's venue in the central district because there may be an embryo in Massachusetts that is damaged by this? There are 400,000 human embryos nationwide. As an example, Susan... That's what I said, and I understand. It doesn't matter how many there are nationwide. They're saying that if an embryonic research team... I prefer the word experimentation team. Call them what you want. It's not important. If one of them captures an embryo in Indiana, venue is in the central district of California because... Well, our plaintiffs reside in Riverside. Correct. Two of the plaintiffs. I understand. And Susan Murray, at this very hour, is giving birth to an adopted human embryo down in Riverside County at Murrieta Hospital. It is an incredible coincidence. He is not affected by, in the central district, by this whatever imminent action is going to be taken by the agency that Prop 71 created. The very thing they're treating as property and seeking to vivisect and destroy, Susan Murray is giving birth to by C-section this morning at 12 noon. An incredible coincidence. She said when she learned of the date of this hearing, she couldn't believe it because that is the date. Her doctor has set for her C-section weeks ago. What in the world does that have to do with whether there's venue in the central district of California? Well... Today you said her. Today she's giving birth at 12 noon. She's giving birth at 12 noon today. To her second child in vitro. Child in vitro adoption. And that has to do with venue in the central district in this case because, in 25 words or less... Because the plaintiffs are aggrieved in this district. The state's action will reduce the number of human embryos... They're not aggrieved by the birth, I take it. Pardon? They're not aggrieved by the birth, I take it. Oh, no, no. No, no. They're very happy with the birth. That doesn't aggrieve them. What aggrieves them is... If Peter Joseph, that she's giving birth to today, had been vivisected in human embryo experimentation, she's affected in California, in Riverside County, in the central district where she is. But it wasn't, and therefore she has venue here because... You could say that if somebody shot a bullet in Arizona and it hit me in Riverside, I would be injured. Yes, I would be. But nobody has shot it yet, and it hasn't struck me. So I have venue in California in the central district because... Well, we're limited in our argument because the court granted the defense motion not to take judicial notice of all the meetings and everything that they've been having. Of course, we have this strange idea that evidence should be put in front of district judges, but never mind at all. And so that eliminates this attachment. But that leaves us, of course, primarily with the argument that venue lies where the effects of the action are felt. And also, this is not a statute passed by the legislature, but it's an initiative voted on by the voters, including the voters of the central district. So what is the action that you believe currently aggrieves your plaintiffs? It's not that the legislation was passed. I mean, that causes no injury. It's only if something else... Well, it wasn't legislation. It was a vote of the initiative. It's treating the human embryo as property. It's reinventing slavery. What injury does that cause? Well, the state itself is aggrieved because it's an abandonment of the state's heritage. You know, California came into the Union as a free state, the 1850 Compromise. The Constitution of the state, that the Court can take judicial notice of, provides under Article I, Section 6, is to be no slavery. And we're reinventing slavery, according to Jerome Lejeune, because we cannot begin human embryo experimentation without that. So this is abandoning the heritage of the state. Does it matter that it perhaps amended the California Constitution? I'm not knowing, Your Honor. Are you indicating the Constitution has been amended to allow slavery? We're saying this did amend it to reinvent slavery, yes. Let's say this initiative amended the California Constitution to allow slavery. Essentially, it has, yes. So how has the California Constitution then violated it? You see, that's why we added the middle name of Scott, Mary Scott, though, because it's reminiscent of the Dred Scott case of 1857 that held that the black man was not person but property. This is the same thing, a century and a half later, cleaned up, miniaturized, and sanitized, that all men, red and yellow, black and white, as human embryos at the beginning of their life are property, not persons. We can be experimented upon. And the courts say, how does it matter? Well, let's say that's conceivable under the statute. But that could happen. Has it happened yet? That what could happen, Your Honor? That embryos have been enslaved. Has it occurred yet? Well, defense counsel told me that yesterday they sold $250 million in bonds to begin that enslavement. That's the money for the chains in the slave ships. Has it been committed to that particular purpose yet? It's, yes, it's continuing and ongoing. This state is... Continuing and ongoing. ...to sell bonds to the tune of $3 billion to get money for human embryo stem cell experimentation. Now, we do not object to the adult stem cell experiment. Only human embryo? No. Have they yet awarded a contract to attack human embryos? I'm assuming yes, not knowing the answer explicitly. Okay. This record doesn't show that anyway, correct? Not in the record. Okay. Counsel, are you admitted to practice before the Ninth Circuit? Yes. You are. Now, the California Attorney General, Deputy Attorney General, herself admitted in her initial brief in support of the defendant's motion that this lawsuit constitutes a facial challenge to the constitutional validity of Proposition 71 to the extent that Prop 71 authorizes and funds human embryo stem cell research. This is, of course, a large part of what it was about. It was the TV campaigns and everything about it. Those that wanted to begin it put $35 million into it. Those that were fighting it had only $600,000 to fight it. I didn't understand what you just said. We're talking about what, a ballot? I'm sorry. The November 4 ballot initiative. Oh, okay. That resulted in Prop 71. Okay. We respectfully submit, Your Honors, that the defendants and the district court misapprehended the nature of the plaintiff's claims asserted by the plaintiff. The plaintiffs are not merely seeking to stop implementation of 71. We're seeking to invalidate, in large part, Prop 71 on its face. I note, also, that in the defendants filed a declaration of tomorrow pactor in support of the appellee's request for judicial notice. And they essentially, and, of course, this judicial notice was granted. Thereby, they brought in the lower court, state court decision of people's advocate, the independent citizens oversight committee. But it's pleasantly flawed on page 9 because it says, this provision prevents the appropriation of funds from the state for the purpose of foreign, of an interest foreign to the state. They're quoting the statute. And it says, it does not, however, preclude the state from expending public funds for legitimate state purposes. Well, we'd respectfully submit that it is foreign to the interest of this state, whose heritage is to come into the union as a free state, to appropriate funds not for adult stem cell research. The promise isn't that. But not a person on the planet has benefited from human embryo stem cell research and to reinvent slavery is against the interest of the state. What's before us on that request for judicial notice, which was granted, is a superior court decision, which is really not very important anymore because there's a California Court of Appeal decision on the same case on a particular issue. And that's how the board of the entity fits into the entity. That's what it's in front of us for. Unless you want to argue about that, it doesn't seem to me that you have to be concerned about the rest of the stuff they may or may not have said. Well, of course, when you file a case, and we filed this one in the federal court in Riverside, and, yes, I'm a member of the Ninth Circuit and also a member of the United States Supreme Court Bar, you say, well, what makes sense? Where do we file it? Well, since two of our plaintiffs reside in Riverside, it makes sense to file it there since it appeared to us that this, you know, the IOC and the CRIM really All the defendants reside up in San Francisco. Well, very curiously, they were conducting business all over the State, and I'm not supposed to talk about that because That's not really what the, that's not relevant to business. But they decided to rent space You have four minutes left, and I have yet to hear you give me one reason why venue lies in the Central District. Well, I would respectfully refer to our written briefs on that. Apparently, I'm not doing it effectively orally, but I think the written briefs communicate that well. Trying to enhance our oral argument, so to continue, we filed there thinking that's the common-sense place. Well, the State, the Attorney General's Office, sought to remove it to the North. Well, don't they think there's a capable judge down in the Central District? Can't they get a fair trial on the issue of the equal humanity of the human embryo in the Central District? Well, somebody once said there are two reasons for doing anything. There are a reason and a good one. What they're truly doing is forum shopping. And now they're giving all the good reasons, and to bolster their case of good reasons, they rented space, because we complained about it in our briefs, and decided they're going to have an official office in the Northern District, and therefore you've got to let them go up there, because that's the forum they choose. Now, we haven't even had the coin toss in the field to begin this game. Yes, Your Honors are right. We're just here this morning at an air-questioned venue. They don't want us to think about what's concerned here. But the argument is over whether it's going to be a home-and-away game. We think it should be in the home where Susan Murray and the other plaintiffs live, where she's giving birth to what the state of California thinks is just potential life, but Susan Murray this morning is proving that it is a life with potential. And we think it should be right here. And, of course, they are looking for the very good reasons to compel the court to move it up north. They tell law students in law school that if the facts are against you, argue the law. Well, the facts of the equal humanity and the personhood of Mary Doe. There's a rosebud that I picked off in a bush of the court coming in this morning at the Law Quay. It's against them. So what do they do? They tie us up here for all this time on the legal arguments to technicalities of venue, which I've never seen anything like it since the boxwood hedges of the palatial gardens of the English had. You get in this venue question. It seems to be so lost. And even the Ninth Circuit has left up in the air, and this is a homework item from the Ninth Circuit, of whether the plaintiff or the defendant has a burden of proof when a question of venue is raised. We're getting cases going two ways on that in the Ninth Circuit. And I think this Court perhaps could use this case to clarify that point as well. Well, I have a total of 20 minutes. I'll sit down and try to think of something to say for the other 10, but I'd like to hear. So you have 1 minute and 40 seconds left. We have we were told we had 20 minutes for each side in this case. Can you use that and give them 1 minute and 40 seconds? I'll reserve that. Maybe you could think of something relevant to argue. Thank you, Your Honor. Perhaps the State does not feel a need to proceed for 20 minutes. That's fine, Your Honor. I just would point out that since the Court was asking what are the substantial events in the Central District, I would point out that there are none. There are only three substantial events in this case. They are the day-to-day activities of the Institute, the standards that the Institute sets for research, and the grants that the Institute funds. And all of those activities take place in the Northern District. So you moved to the Smithsonian. Do you think there are other jurisdictional issues present? Yes. There are many other jurisdictional issues present, which is why the Court declined to transfer the case. I would just say that there is absolutely no basis whatsoever for venue in the Central District. There is no defendant that resides in the Central District, so it would be inconvenient for them. It's a small agency with the entire staff in San Francisco, three defendants in Sacramento. None of the defendants engaged in any significant activities in the Central District related to this dispute, so it would be unfair to them to have to come to the Central District. It would also be distant from the bulk of the evidence, all of which is in San Francisco, all the records of the Institute. And in short, there's just no substantial connection between the Central District and the claims in this case that would justify requiring 33 State defendants to leave their posts and travel at taxpayer's expense to a district that's remote from the Central District. Thank you. Thank you, Your Honor. Well, I'm thinking of Your Honor's challenge, something relevant. I think it's the great secret of all lawyers and judges that we first make up our Then we look around for the law to do it. We say, if asked, well, the law made me do it, I had no choice. But in reality, we make the law do it. A good example of that is the 2000 election. The dimpled chad was thrown into the Supreme Court. Five of the judges decided that the law and the Constitution said that Governor Bush should be elected president. Four of the judges decided that the law and the Constitution mandated that Al Gore be elected president. Curiously, they voted the same way they could have been expected to vote in the booth, Republican and Democrat. This proves that we, as judges and lawyers, first decide what we want to do, then we look for the law to make up our minds to do it. That's why I gave the example of the rose, because I bought a larger rose this morning coming in. It's beautiful in Pasadena. It begins as the embryo, the bud, and flowers. The very bud that we nip could be the future Jonas Salt, the future Jerome Lejeune. And we what? We kill his property. Judge Collins, Judge Fernandez, Judge Wardlaw. Not since Judge Roy Dean of Wild West fame has there been a court with as much autonomy as the Ninth Circuit. Good heavens, on the East Coast, all they can think about is taking the words, one nation under God, out of the pledge, as I look at that flag this morning. And God bless you, Your Honor, for putting them back in, and the eight-to-one decision of the Supreme Court did just that. Thank you, Congressman. The case, as argued, will be submitted. The justice center down the street is being dedicated, and Schwarzenegger is speaking there for justice. That's what we're here for. And we will be in recess for ten minutes.
judges: Fernandez, Wardlaw, Collins